**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI,
EASTERN DIVISION**

**JANE DOE**                                                                                      **PLAINTIFF**

**VS.**                                                                      **CAUSE NO. 2:25-cv-137-KS-BWR**

**JOSE AGUIRRE, individually and in his capacity as an
Employee and Director/Supervisor/Manager for and/or on behalf of
CHS/Community Health Systems, Inc., CHSPSC, LLC,
Wesley Health System LLC, Wesley Physician Services,
LLC, Hattiesburg HB Medical Services, QHG of Hattiesburg, Inc.,
and QHG of Forrest County, Inc.;
CHS/COMMUNITY HEALTH SYSTEMS, INC., individually
and d/b/a Merit Health Wesley;
CHSPSC, LLC, individually and d/b/a Merit Health Wesley;
WESLEY HEALTH SYSTEM LLC, individually and
d/b/a Merit Health Wesley;
WESLEY PHYSICIAN SERVICES, LLC; , individually and
d/b/a Merit Health Wesley;
HATTIESBURG HB MEDICAL SERVICES; individually and
d/b/a Merit Health Wesley;
QHG OF HATTIESBURG, INC., individually and d/b/a
Merit Health Wesley;
QHG OF FORREST COUNTY, INC., individually and d/b/a
Merit Health Wesley;
and JOHN DOES 1, 2, 3, 4, 5, 6, 7, 8, 9, and 10**                   **DEFENDANTS**

**COMPLAINT
(Jury Trial Requested)**

Plaintiff, by and through counsel, files her Complaint against the named Defendants, as follows:

**PARTIES**

1. Plaintiff Jane Doe ("Jane Doe") is an adult resident citizen of Pearl River County, Mississippi.

At all material times Jane Doe was employed by Defendants as a Nurse Practitioner at Merit Health

Wesley, a hospital located at 5001 Hardy Street, Hattiesburg, Mississippi 39402 (hereinafter "the

Hospital"), and was under the direct supervision and control of Defendant, Dr. Aguirre.

2. Whereas different employment agreements presented to Jane Doe identified her "Employer"

alternatively as Wesley Physician Services, LLC ("Wesley Physician") and Hattiesburg HB Medical

Services, LLC ("HBMS"), pay stubs from Defendants showed that her "Legal Employer" is QHG of Hattiesburg, Inc. ("QHG Hattiesburg"), and paychecks were written on checks with that entity's name. The January 23, 2025 and May 22, 2025 employment agreements, which respectively name Wesley Physician and HBMS as the "Employer", state that Jane Doe will provide medical services "exclusively on behalf of Employer." However, as demonstrated by the referenced pay stubs, Jane Doe was clearly also providing services for QHG Hattiesburg. Further, the employment agreements state that they are only valid if reviewed and agreed upon by a representative of CHSPSC, LLC, which is identified as the "Employer's Management Company." Also, both employment agreements reference numerous policies and procedures that purportedly form a part of the employment agreement and must be complied with (even though they weren't all provided to Jane Doe), including but not limited to Codes of Conduct, coding and billing policies, training policies, and medical staff bylaws. On information and belief those policies were formulated by the parent company, Defendant CHS/Community Health Systems, Inc. ("CHS"), or one of CHS's other subsidiary or affiliate companies named herein, providing further evidence that the actual "Employer" of Jane Doe was the *conglomeration* of the entity Defendants and John Doe Defendants named herein. Finally, both employment agreements state the Employer has the right to assign the agreement, without Jane Doe's consent, to "any parent of, subsidiary of, or entity affiliated with Employer." All of the entity Defendants named herein, and one or more John Doe Defendants, fall into one or more of those categories.

3. Defendant Jose Aguirre ("Dr. Aguirre"), individually and in his capacity as an Employee and Supervisor/Manager for and/or or on behalf of CHS/Community Health Systems, Inc., CHSPSC, LLC, Wesley Health System LLC, Wesley Physician Services, LLC, Hattiesburg HB Medical Services, QHG of Hattiesburg, Inc., and QHG of Forrest County, Inc. is, on information and belief, an adult resident citizen of Nevada who committed torts in the State of Mississippi. At all material

times Dr. Aguirre was employed by the conglomeration of the entity Defendants and John Doe Defendants named herein as a Supervisor and/or Director and/or Manager at Merit Health Wesley, and was empowered by those employers, and possessed, the powers to take tangible employment actions against Jane Doe, such as canceling her contract, firing, failing to promote, reassignment with significantly different responsibilities, change in shifts to less desirable hours and times, and similar actions. The entity defendants likewise granted Dr. Aguirre the powers of supervision, training, management, and hiring/firing over employees of Defendants working at Merit Health Wesley including Jane Doe. At all material times, Dr. Aguirre was acting, and/or neglected to act, in the course and scope of his employment and position with the entity Defendants named herein as a Supervisor and/or Director and/or Manager over Jane Doe. Dr. Aguirre is made a defendant individually, and in his official capacity as an Employee and Supervisor and/or Director and/or Manager of the corporate/LLC defendants and John Doe Defendants named herein. Dr. Aguirre may be served with process at his home address, 2645 Anzac Cir, Carson City, Nevada 89701-6802, or wherever he may be found in accordance with law.

4. Defendant CHS/Community Health Systems, Inc. ("CHS"), individually and d/b/a Merit Health Wesley, is a Delaware corporation with its principal office address at 4000 Meridian Blvd, Franklin, TN 37067-6325, which is not licensed to do business in Mississippi but which on information and belief is doing business in the State of Mississippi as, and/or hiring/employing/training/supervising medical providers and/or administrators working at, Merit Health Wesley individually and/or through its subsidiaries and/or affiliate companies, including but not limited to CHSPSC, LLC, Wesley Health System LLC, Wesley Physician Services, LLC, Hattiesburg HB Medical Services, QHG of Hattiesburg, Inc., and QHG of Forrest County, Inc.. At all material times CHS employed Dr. Aguirre and/or one or more of the as yet unidentified John Does 1-10, and was the de facto employer of Jane Doe. At all material times CHS was an employer

defined by § 701(b) of Title VII as amended by the 1991 Civil Rights Act and the 1964 Civil Rights

Act, 42 USCS 2000e(b). CHS may be served with process in accordance with law, upon its registered

agent for service of process Russell Baldwin, 4000 Meridian Blvd, Franklin, TN 37067.

5. Defendant CHSPSC, LLC ("CHSPSC"), individually and d/b/a Merit Health Wesley, is a

Delaware Limited Liability Company with its with its principal office address at 4000 Meridian Blvd,

Franklin, Tennessee 37067, which is licensed to do and doing business in Mississippi as, and/or

hiring/employing/training/supervising medical providers and/or administrators working at, Merit

Health Wesley individually and/or through its subsidiaries and/or affiliate companies, including but

not limited to Wesley Health System LLC, Wesley Physician Services, LLC, Hattiesburg HB Medical

Services, QHG of Hattiesburg, Inc., and QHG of Forrest County, Inc.. At all material times

CHSPSC employed Dr. Aguirre and/or one or more of the as yet unidentified John Does 1-10, and

was the de facto employer of Jane Doe. At all material times CHSPSC was an employer defined by §

701(b) of Title VII as amended by the 1991 Civil Rights Act and the 1964 Civil Rights Act, 42 USCS

2000e(b). CHSPSC may be served with process by service upon its registered agent, Corporation

Service Company, 109 Executive Drive, Suite 3, Madison, Mississippi 39110.

6. Defendant Wesley Health System LLC ("Wesley Health"), individually and d/b/a Merit

Health Wesley, is a Delaware Limited Liability Company with its principal office address at 4000

Meridian Blvd. Franklin, Tennessee 37067, which is licensed to do and doing business in Mississippi

as, and/or employing medical providers and/or administrators working at, Merit Health Wesley

individually and/or through its subsidiaries and/or affiliate companies, including but not limited to

Wesley Physician Services, LLC, Hattiesburg HB Medical Services, QHG of Hattiesburg, Inc., and

QHG of Forrest County, Inc.. At all material times Wesley Health employed Dr. Aguirre and/or

one or more of the as yet unidentified John Does 1-10, and was the de facto employer of Jane Doe.

At all material times Wesley Health was an employer defined by § 701(b) of Title VII as amended by

the 1991 Civil Rights Act and the 1964 Civil Rights Act, 42 USCS 2000e(b). Wesley Health may be served with process by service upon its registered agent, Corporation Service Company, 109 Executive Drive, Suite 3, Madison, Mississippi 39110.

7. Defendant Wesley Physician Services, LLC ("Wesley Physician"), individually and d/b/a Merit Health Wesley, is a Delaware Limited Liability Company with its principal office address at 4000 Meridian Blvd, Franklin, Tennessee 37067, which is licensed to do and doing business in Mississippi as, and/or employing medical providers and/or administrators working at, Merit Health Wesley individually and/or through its subsidiaries and/or affiliate companies, including but not limited to Hattiesburg HB Medical Services, QHG of Hattiesburg, Inc., and QHG of Forrest County, Inc.. At all material times Wesley Physician employed Dr. Aguirre and/or one or more of the as yet unidentified John Does 1-10, and was the employer of Jane Doe. At all material times Wesley Physician was an employer defined by § 701(b) of Title VII as amended by the 1991 Civil Rights Act and the 1964 Civil Rights Act, 42 USCS 2000e(b). Wesley Physician may be served with process by service upon its registered agent, Corporation Service Company, 109 Executive Drive, Suite 3, Madison, Mississippi 39110.

8. Defendant Hattiesburg HB Medical Services, LLC ("HBMS"), individually and d/b/a Merit Health Wesley, is a Delaware Limited Liability Company with its principal office address at 4000 Meridian Blvd, Franklin, TN 37067, which is licensed to do and doing business in Mississippi as, and/or employing medical providers and/or administrators working at, Merit Health Wesley individually and/or through its subsidiaries and/or affiliate companies, including but not limited to QHG of Hattiesburg, Inc., and QHG of Forrest County, Inc.. At all material times HBMS employed Dr. Aguirre and/or one or more of the as yet unidentified John Does 1-10, and was the employer of Jane Doe. At all material times HBMS was an employer defined by § 701(b) of Title VII as amended by the 1991 Civil Rights Act and the 1964 Civil Rights Act, 42 USCS 2000e(b). HBMS may be

served with process by service upon its registered agent, Corporation Service Company, 109 Executive Drive, Suite 3, Madison, Mississippi 39110.

9. Defendant QHG of Forrest County, Inc. ("QHG Forrest County"), individually and d/b/a Merit Health Wesley, is a Mississippi Corporation with its principal office address at 4000 Meridian Blvd, Franklin, TN 37067, which is licensed to do and doing business in Mississippi as, and/or employing medical providers and/or administrators working at, Merit Health Wesley individually and/or through its subsidiaries and/or affiliate companies, including but not limited to QHG of Hattiesburg, Inc.. At all material times QHG Forrest County employed Dr. Aguirre and/or one or more of the as yet unidentified John Does 1-10, and was the employer of Jane Doe. At all material times QHG Forrest County was an employer defined by § 701(b) of Title VII as amended by the 1991 Civil Rights Act and the 1964 Civil Rights Act, 42 USCS 2000e(b). QHG Forrest County may be served with process by service upon its registered agent, Corporation Service Company, 109 Executive Drive, Suite 3, Madison, Mississippi 39110.

10. Defendant QHG of Hattiesburg, Inc. ("QHG Hattiesburg"), individually and d/b/a Merit Health Wesley, is a Mississippi Corporation with its principal office address at 4000 Meridian Blvd, Franklin, TN 37067, which is licensed to do and doing business in Mississippi as, and/or employing medical providers and/or administrators working at, Merit Health Wesley individually and/or through its subsidiaries and/or affiliate companies, including but not limited to QHG of Forrest County, Inc.. At all material times QHG Hattiesburg employed Dr. Aguirre and/or one or more of the as yet unidentified John Does 1-10, and was the employer of Jane Doe. At all material times QHG Hattiesburg was an employer defined by § 701(b) of Title VII as amended by the 1991 Civil Rights Act and the 1964 Civil Rights Act, 42 USCS 2000e(b). QHG Hattiesburg may be served with process by service upon its registered agent, Corporation Service Company, 109 Executive Drive, Suite 3, Madison, Mississippi 39110.

11. Plaintiff is ignorant of the true names and capacities of the Defendants sued as John Does 1, 2, 3, 4, 5, 6, 7, 8, 9, and 10 inclusive, and therefore sues these Defendants by such fictitious names and capacities. Plaintiff will amend her Complaint to allege their true names and capacities when ascertained. Plaintiff alleges that each fictitiously-named Defendant is responsible in some manner for the occurrences, injuries, and damages alleged, and that Jane Doe's injuries were proximately caused by the conduct of each such Defendant. All allegations herein against "Defendants" and "Merith Health" are incorporated by reference against John Does 1, 2, 3, 4, 5, 6, 7, 8, 9, and 10.

## VENUE AND JURISDICTION

12. This action is filed pursuant to Title VII of the Civil Rights Act of 1964, AS AMENDED, PURSUANT TO 42 U.S.C. § 2000e et. seq., to redress injuries suffered by Jane Doe as a result of the unlawful sexual abuse/rape, sexual harassment, discrimination and constructive discharge/retaliation on the part of the Defendants; and the present cause of action is further brought before this Court for the intentional and/or negligent infliction of emotional distress, physical/verbal abuse, and assault and battery directed against Jane Doe by the Defendants.

13. The Court has jurisdiction over the parties and the subject matter to the present cause of action pursuant to 28 U.S.C. §§ 1331, 1343, and/or 42 U.S.C. §1988 with regard to Jane Doe's claims of sexual assault / sexual harassment / violation of her civil rights, and by virtue of this Court's supplemental jurisdiction under 28 U.S. C. § 1367(a) over Jane Doe's common law claims.

14. Jane Doe exhausted her administrative remedies, as required by 42 U.S.C. §2000e *et seq.*, in that she made a timely filing of her Charges of Discrimination with the Equal Employment Opportunity Commission, and subsequent thereto, Jane Doe received a Notice of Right to Sue from the United States Equal Employment Opportunity Commission, and this Complaint is timely filed with this Court within ninety (90) days of her receipt thereof.

15. The alleged claims arose from the Defendants' material acts and omissions in Hattiesburg, Lamar County, Mississippi, all within the Eastern / Hattiesburg division of the Southern District of the United States District Court for Mississippi.

16. Venue over Jane Doe's claims is proper in this Court pursuant to 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1391(b).

## FACTS

17. All other paragraphs are incorporated in this section.

18. Whenever and wherever reference is made in this Complaint to any act by "Defendants", such allegations and references shall also be deemed to mean the acts and failures to act of each Defendant acting individually, jointly, and or severally.

19. At all material times Defendants, acting individually and in concert with each other as set forth below, acted unreasonably and with deliberate indifference to and in reckless disregard for, and failed to exercise due care for, the safety and rights of Jane Doe.

20. For the reasons and facts stated within the "Alter Ego / Co-Principal" allegations below and in ¶2 above, which are incorporated herein, unless otherwise stated hereinafter Defendants CHS, CHSPSC, Wesley Health, Wesley Physician, HBMS, QHG Hattiesburg, and QHG Forrest County will be **collectively referred to as "Merit Health"** given their joint and combined roles in the operation of Merit Health Wesley and the hiring, employment, training, management, and supervision of medical providers working at the hospital. At all material times Merit Health employed Dr. Aguirre and Jane Doe. The physical location of Merit Health Wesley and where Plaintiff and Dr. Aguirre reported to work will be referred to henceforth as "the Hospital".

21. On November 11, 2025 Ron Cain ("Cain"), Vice President of Physician Support, and Travis Sisson ("Sisson"), Chief Executive Officer of Merit Health (employees of Merit Health), interviewed Jane Doe and offered her a NP: Nocturnist position at the Hospital in Hattiesburg, Mississippi.

22. On January 23, 2025 Jane Doe signed an Advanced Practice Clinician Employment Agreement, dated January 22, 2025, with Wesley Physician Services, LLC as the named employer, as an Advanced Practice Clinician, Specialty NP: Nocturnist at the Hospital. Sisson signed as an authorized signatory on behalf of Wesley Physician Services, LLC on January 23, 2025. Jane Doe's expected practice commencement date was January 27, 2025, or within ninety (90) days thereafter with an annual base salary of $140,000.00 and additional shift compensation of $800.00 per additional 12-hour shift provided over and above forty-five (45) 12-hour shifts per quarter, up to a maximum of twelve (12) additional shifts annually.

23. On February 5, 2025 Jane Doe started working at the Hospital as a nocturnist nurse practitioner. Jane Doe's shifts were overnight, Thursday to Thursday, from 7 p.m. to 7 a.m. every other week.

24. When Jane Doe was originally hired Cain and Sisson told Jane Doe that if a day shift became available she could move from night shift to day shift.

25. On April 29, 2025 Jane Doe spoke with Michele Gutermuth ("Gutermuth"), recruiter for CHS and/or CHSPSC, LLC, who told her that the hospitalist group, consisting of nurse practitioners, physicians, etc. employed by Merith Health, was transitioning to another entity within CHS and/or CHSPSC, LLC, and that Jane Doe and other hospitalists were required to sign a new employment agreement. Gutermuth discussed the new agreement with Jane Doe, and Jane Doe told Gutermuth that she was not going to sign the new agreement because she was having difficulty working nights due to her lengthy commute, noting she had dozed off a couple of times on her commute home after work, and that the new contract increased the advance notice to resign time from 30 days to 90 days. Jane Doe expressed to Gutermuth that she loved her job with Merit Health, and stated that if a day shift became open she would be interested in taking that position.

26. On April 29, 2025 Cain sent a group text including Jane Doe and other mid-level hospitalists notifying them that Gutermuth would be reaching out to them about their new contract and informing them that the hospitalist group was transitioning to another entity within CHS and/or CHSPSC, and requested that those in the group text review and sign their new contracts as soon as possible since they would be transitioning June 1, 2025.

27. On May 6, 2025 Gutermuth asked Jane Doe if she would be willing to continue working the night shift through the month of June. Gutermuth explained that if Jane Doe did not work they would have to hire a locum (contract) provider which would cost Merit Health more money. Gutermuth offered to pay Jane Doe more than Jane Doe's current rate for the month of June in lieu of having to pay a locum provider. Gutermuth asked Jane Doe if, instead of resigning, she would sign a PRN contract so that if a day shift became available Jane Doe could easily move into that position without having to be rehired and/or redo her credentialing at Merit Health. Jane Doe was open to this offer.

28. Also on that day Jane Doe received an email from Karla Wilson, Manager of administrative and medical staff services at Merit Health, inviting her to attend a medical staff meet and greet on May 8, 2025 from 5:30 p.m. until 7 p.m. The email stated that Dr. Aguirre was the new hospitalist medical director, which meant Dr. Aguirre would be Jane Doe's new supervisor/manager and boss. Jane Doe was unable to attend the meet and greet due to working the night shift, therefore, did not meet Dr. Aguirre on that date.

29. On May 9, 2025 Jane Doe was driving to her shift at the Hospital when she received a text from Dr. Aguirre requesting Jane Doe to call him. This was the first communication Jane Doe had with Dr. Aguirre. During their brief phone call Dr. Aguirre told Jane Doe he may change her night shift schedule to day shift due to the possibility of a day shift becoming available. Jane Doe and Dr. Aguirre also discussed other work-related topics.

30. When Jane Doe arrived at the Hospital that same day she texted Dr. Aguirre and asked if he was in his office because she wanted to meet her new boss in person for the first time. Dr. Aguirre told Jane Doe he was not at the hospital but would come in early the next morning before she left her night shift to meet Jane Doe in person.

31. On the morning of May 10, 2025 Dr. Aguirre texted Jane Doe to let her know that he was at the Hospital. At approximately 6:40 a.m. Jane Doe met Dr. Aguirre in the hospitalist's office on the 2nd floor of the Hospital. Dr. Aguirre advised Jane Doe that he was planning on using an office located in the hospitalist's office and was also working out of his nearby hotel provided by Merit Health when he did not have to be at the Hospital. Dr. Aguirre showed Jane Doe where Secretary Cindy Cantrell's ("Cantrell") office was located, and another room that he planned to use for meetings/classes.

32. Dr. Aguirre told Jane Doe that he was originally from south Florida, but he had been living in Carson City, Nevada for the last twenty years. Dr. Aguirre said that he would be going back and forth from the Hospital to his home in Nevada. Dr. Aguirre told Jane Doe about his background in medicine and how he was friends with someone working with CHS and/or CHSPSC, LLC in Nevada, and that person knew Dr. Aguirre was good at fixing underperforming hospitals. At the time Merit Health was underperforming financially and hired Dr. Aguirre to fix these issues.

33. Dr. Aguirre told Jane Doe of his intention to eliminate the position of night shift nocturnist nurse practitioner because he did not feel nights were busy enough to justify having both a physician and a mid-level provider. Dr. Aguirre told Jane Doe that he was "OCD" and watched the ER tracking board at night to monitor how busy the Hospital was (and what each employee was doing). Dr. Aguirre also asked who provided cross coverage for the floors and ICU (medical doctors or nurse practitioners), who responded to codes, etc. Dr. Aguirre stated that he felt day shift needed additional mid-level providers and that he would be adding those positions soon, in the next two-to-

three months, and that Jane Doe would be able to take one of those positions once they became available.

34. Dr. Aguirre asked Jane Doe if she would be willing to stay on and work nights until that change could take effect if he changed her schedule to make her commute easier. Dr. Aguirre mentioned possibly allowing Jane Doe to leave earlier or come in later, but stated he needed more time to think about possible solutions and would get back to Jane Doe in the next few days. Jane Doe told Dr. Aguirre that she was open to trying a different schedule at night until a day shift became available because she truly loved her job at Merit Health and did not want to leave. During this meeting Dr. Aguirre appeared very professional, approachable and supportive.

35. On May 13, 2025 Dr. Aguirre called Jane Doe while she was on the way to the Hospital for her night shift. Dr. Aguirre said he wanted to discuss how the attending physicians were assigned for overnight admits. After Jane Doe told Dr. Aguirre how they were assigned Dr. Aguirre told her to do it a different way, and for her to assign the first 6-7 admits that night to Dr. Aguirre. Dr. Aguirre also discussed allowing Jane Doe to start leaving at 5 a.m. instead of 7 a.m. beginning on May 22, 2025, which would be the first day of Jane Doe's next work week. Jane Doe agreed that she would try that and see if would work for her. Dr. Aguirre told Jane Doe he would let the physician she works with on the night shift, Dr. Richard Lock ("Dr. Lock"), know about the schedule change, and that he would also take full responsibility for her leaving early. A few minutes later, Dr. Aguirre texted Jane Doe and asked if she had requested a PRN contract. Jane Doe called Dr. Aguirre to explain to him that the PRN contract was proposed by Gutermuth prior to the conversation Dr. Aguirre and Jane Doe had on May 10, 2025.

36. On May 14, 2025 Jane Doe sent Dr. Aguirre a screenshot of texts between Jane Doe and Natalia, someone supposedly in charge of Jane Doe's scheduling. Jane Doe was confused because Natalie was trying to confirm Jane Doe's schedule, but Jane Doe worked the same days and times

every other week. Jane Doe and Dr. Aguirre discussed other work topics. Dr. Aguirre asked Jane

Doe to call him to discuss "OBS" status for patients. Jane Doe called Dr. Aguirre at approximately

8:30 p.m. and Dr. Aguirre explained the difference between assigning a patient to observation versus

assigning a patient to impatient status and the effects of this on insurance reimbursement.

37. On May 15, 2025 Jane Doe followed up with a text to Dr. Aguirre regarding inpatient versus

observation status. Jane Doe and Dr. Aguirre texted about other work issues. Dr. Aguirre told Jane

Doe he wanted to discuss diagnoses versus symptoms in Merit Health's documentation system

sometime that day or the next day. Jane Doe told Dr. Aguirre that she was leaving soon to take her

daughter and her friends to the beach in Gulf Shores, Alabama for her daughter's birthday, but she

would call him to discuss it the next day.

38. On May 16, 2025 at 6:22 p.m. Jane Doe told Dr. Aguirre she had some downtime and Dr.

Aguirre called her to discuss documentation, specifically ICD 10 billing codes for better

reimbursement. Dr. Aguirre told Jane Doe that he reads all the providers' notes to see who was

doing a good job with this and who wasn't. Dr. Aguirre and Jane Doe discussed other work topics.

Dr. Aguirre told Jane Doe that he was only expected to be in his position for a year or so and then

his replacement would be hired. Jane Doe was disappointed to hear this because she appreciated all

Dr. Aguirre was teaching her because it was helping her become better at her job. Dr. Aguirre also

mentioned that he was spending the weekend in New Orleans.

39. Up until this point the communications between Dr. Aguirre and Jane Doe were mainly

work-related. Dr. Aguirre provided a lot of teaching and was professional and Jane Doe was grateful

to have a good working relationship with her new supervisor/manager/boss.

40. On May 16, 2025 at 9:12 p.m. Dr. Aguirre texted Jane Doe and asked how the beach was in

Gulf Shores because he had never been there. Jane Doe and Dr. Aguirre texted back and forth

about different beaches.

41. On May 17, 2025 Dr. Aguirre and Jane Doe exchanged some casual texts. Jane Doe asked Dr. Aguirre if she should be concerned since she had not received the updated contract from Gutermuth. Dr. Aguirre told Jane Doe not to be concerned, and the two discussed Merit Health's billing software training. Jane Doe mentioned that she was considering going back to school for DNP and possibly acute care subspecialty. Dr. Aguirre told Jane Doe that they were voting the following week at Merit Health on doing away with the bylaws which govern nurse practitioners, which he explained was a necessary first step to be able to implement the cost-saving practices he had in mind. He also explained this would help facilitate moving Jane Doe to day shifts. Dr. Aguirre and Jane Doe exchanged additional casual texts. Dr. Aguirre mentioned he was returning to his [Merit Health supplied] hotel room adjacent to the hospital in Hattiesburg the following day, and that the Hospital was supposed to be getting him an apartment.

42. On May 18, 2025 Jane Doe sent Dr. Aguirre a video of the beach since he asked how it was earlier that weekend. Dr. Aguirre texted Jane Doe at 8:24 p.m. that night and asked if Jane Doe made it home yet. Jane Doe and Dr. Aguirre discussed their weekends. Jane Doe asked Dr. Aguirre if he would get to speak to the medical staff before they voted on the bylaws and what would happen if they did not vote to remove them.

43. On May 19, 2025 Dr. Aguirre responded "[w]e will know after tomorrow." Dr. Aguirre and Jane Doe exchanged pictures of their dogs and talked about their pets. Dr. Aguirre asked when Jane Doe would be returning to work. Jane Doe told Dr. Aguirre that she would be returning on Thursday, May 22, 2025 and that she had to come in early to meet with IT because she was having computer issues. Jane Doe told Dr. Aguirre she would likely go rest in the General Medical Education "GME" room,  which was an area for residents and physicians equipped with a kitchenette, living area, sleeping area, offices, bathrooms, computers, etc., while waiting for her 7:00 p.m. shift. Dr. Aguirre told Jane Doe she could take his hotel room key and rest on the extra bed in

his room if the GME were not comfortable, and explained that he would not be there because he would be working at the Hospital. Dr. Aguirre apologized in case Jane Doe thought the offer was "weird", which she did not because he stated he would not be there. The hotel is very close to the Hospital. Jane Doe told him she would let him know once she finished up with IT.

44. On May 22, 2025 at 9:10 a.m. Jane Doe signed an Advanced Practice Clinician Employment Agreement dated May 14, 2025 with HBMS as the named employer, as an Advanced Practice Clinician, NP with a Specialty listed as Hospitalist at Merit Health Wesley. Ben Youree signed as authorized signatory on behalf of HBMS on May 22, 2025. Jane Doe's expected practice commencement date was June 1, 2025 or within ninety (90) days thereafter. Jane Doe was to work a minimum of one hundred sixty-eight (168) hours per month and paid a base monthly salary of $4,800.00 for the first eighty (80) hours worked in a calendar month. After Jane Doe worked eighty (80) hours in a calendar month, she was to be compensated at a rate of $60.00 per hour for any hours worked during a day shift. Any hours worked during a night shift Jane Doe was to be compensated at a rate of $69.00 per hour (even if such hours were during the first eighty (80) worked hours in a calendar month). Additional holiday premium compensation was also included in the contract.

45. On the morning of May 22, 2025, after Dr. Aguirre texted Jane Doe, Jane Doe asked how the voting went. Dr. Aguirre said CEO Sisson did not present it and he would explain later. It was Jane Doe's intention that either before or after she met with IT, depending on what time she arrived at the Hospital, she would go to Dr. Aguirre's office to discuss why the vote didn't happen, what happened if the bylaws were not changed and how that would affect her schedule and promised move to day shift, and if Dr. Aguirre told the Dr. Lock that Jane Doe was going to start leaving her shift at 5 a.m. Jane Doe was also supposed to meet with Cantrell who texted Jane Doe earlier in the week about coming by to pick up a gift for the providers at the Hospital. Jane Doe was going to pick

up her gift and meet Cantrell since she had not met her in person due to working the night shift. Jane Doe then planned on going to the GME to rest, after speaking with Dr. Aguirre in his office.

46. On May 22, 2025 at approximately 3:45 p.m. Jane Doe arrived at the Hospital, and messaged Dr. Aguirre and asked if he was in his office. Dr. Aguirre replied that he was [working] at his hotel because he had several calls put on his calendar last minute and had not been able to get back to the Hospital. Jane Doe told Dr. Aguirre that she planned on coming by his office if he was there. Dr. Aguirre stated he was not there, but Jane Doe was welcome to come to his hotel once he finished his calls. Jane Doe told Dr. Aguirre she would let him know when she was done with IT.

47. Jane Doe texted Dr. Aguirre after she finished up with IT at 4:51 p.m. and Dr. Aguirre told Jane Doe he was on a call and asked what she was going to do. Jane Doe told Dr. Aguirre since he was busy she would stay at the Hospital and rest. Dr. Aguirre told Jane Doe that he would be done in approximately 15 minutes and it was fine for Jane Doe to come over to his hotel [to discuss her work schedule and the status of a change to day shift]. Jane Doe indicated she would head that way, and Jane Doe went to the hotel where Dr. Aguirre was staying, the Courtyard Marriot.

48. Jane Doe arrived at the Courtyard Marriot at 5:04 p.m. and asked Dr. Aguirre for his room number. Jane Doe arrived at Dr. Aguirre's hotel room at approximately 5:10 p.m. Dr. Aguirre was on the phone with Dr. Crane, an employee of Merit Health who was Dr. Aguirre's boss. The hotel room had two beds to the right of where you entered the room, and Jane Doe presumed Dr. Aguirre had slept in the one closest to the door since it was unmade. Dr. Aguirre was sitting in a chair at a desk located at the foot of the bed further away from the door. Jane Doe put her purse down on the chair in between the further bed from the door and the window and sat at the foot of the bed. After a few minutes Dr. Aguirre got off the phone, told Jane Doe he was going downstairs to get some water, and asked Jane Doe if she wanted anything. Jane Doe told Dr. Aguirre that she wanted a bottle of water and Dr. Aguirre left the room. A few minutes later, at 5:25 p.m., Dr.

Aguirre texted Jane Doe and told her he would give her an hour or so to rest and asked if she wanted sparkling or regular water. Jane Doe told him that she wanted regular water and that it would not bother her if he was in the room. Jane Doe was there to speak to Dr. Aguirre about work issues, not to sleep.

49. Dr. Aguirre returned to the room with water at approximately 5:40 p.m. Jane Doe sat at the end of the bed and the two discussed work topics. Dr. Aguirre explained that the vote did not happen because CEO Sisson "didn't know what he was doing." Dr. Aguirre stated that Sisson was "a nice guy but clueless" in his role and also said "he's younger than us". He further explained that for some reason Sisson went to the legal department regarding the bylaw issue which frustrated Dr. Aguirre. Jane Doe said she thought Sisson was about the same age as her and that she would turn fifty in September. Dr. Aguirre said he thought Sisson was in his forties and that he would turn fifty-three on August 21, 2025, then added "but I moisturize." At some point Dr. Aguirre mentioned that he went to the most recent Kentucky Derby with an older male friend and that he picked the winner. Dr. Aguirre asked Jane Doe what the horseshoe ring she was wearing meant. Jane Doe told him that the ring was a gift from her husband, and she has owned and ridden horses most of her life. Jane Doe also mentioned that she briefly took a break from nursing in 2018 and worked as a floor supervisor at Harrah's casino in New Orleans, and that when she worked there many people thought that her ring signified "luck."

50. Dr. Aguirre told Jane Doe that the older male friend who he attended the Kentucky Derby with is a member of the family that started Harrah's casino as a mom-and-pop business in his hometown of Carson City, Nevada. He told Jane Doe that Harrah's hotel is where he stays when he goes to New Orleans. Dr. Aguirre and Jane Doe then talked more about her work schedule. Jane Doe asked him, if the vote didn't go in their favor, if that meant she would not be able to change to day shift. Dr. Aguirre replied that because the way things were working at the time was very

inefficient, it would not make financial sense to put another mid-level provider on day shift if the

bylaws were not changed. He then said that at least Jane Doe could start leaving at 5 a.m. the next

morning and hopefully that would help her out. Jane Doe asked him if he ever notified Dr. Lock

that she was going to start leaving at 5 a.m., and he said no but he would do it before 7 p.m.. During

this time, Dr. Aguirre sat in the chair at the foot of the bed and was calm, professional, and friendly.

Jane Doe did not feel worried or uncomfortable.

51. At 6:30 p.m. Jane Doe's alarm went off for her to return to the Hospital for her 7:00 p.m.

shift. Jane Doe leaned forward to get her purse off of the chair and picked up her phone and water

bottle. As Jane Doe stood up to go out the door Dr. Aguirre got up from his chair and stood

between Jane Doe and the door to exit. Dr. Aguirre's demeanor shifted instantly from professional,

courteous, and respectful to cold, aggressive, and intimidating with a blank facial expression. Jane

Doe knew and could feel something was off. It was immediately clear to Jane Doe that Dr. Aguirre

had been masking his true intent. Dr. Aguirre grabbed Jane Doe and started forcefully kissing and

groping her. He then pushed Jane Doe onto the bed and got on top of her. Within seconds Dr.

Aguirre had his hands in Jane Doe's underwear and on her breasts. Dr. Aguirre unhooked Jane

Doe's bra and started forcefully putting his fingers into her vagina. Dr. Aguirre then rolled off from

on top of Jane Doe, onto his back, took his pants off, and had an erection. Dr. Aguirre aggressively

grabbed Jane Doe's hair and pushed her head down forcing her to perform oral sex, which caused

her to gag repeatedly. Jane Doe was caught completely off guard. She was panicked, shocked, and

terrified.

52. As a survivor of childhood sexual assaults, Jane Doe was deeply triggered by this power

dynamic and helpless feeling. While Dr. Aguirre was forcing Jane Doe to perform oral sex, Jane Doe

looked up and could see that it was 6:48 p.m.. Jane Doe, finally able to pull away, told Dr. Aguirre

that she had to go because she was going to be late for work. Dr. Aguirre replied "yeah, I waited

because I needed to make sure you weren't crazy." Dr. Aguirre then said something along the lines

of acknowledging his position and that he could get in trouble. Jane Doe asked if he would get in

trouble in regard to her since he had the ability to cancel her contract, to which Dr. Aguirre

responded "yeah, I do have the ability to do that."

53. Jane Doe reiterated that she needed to leave. Dr. Aguirre told her "I want one more lick

before you leave" and forced Jane Doe to perform oral sex again. After Dr. Aguirre finally let Jane

Doe break away Jane Doe was unable to hook her bra because she could not get her hands to

function properly. She asked Dr. Aguirre to hook it, which he did. Dr. Aguirre got up and went to

the desk. He handed Jane Doe a room key card and commanded her to "come back at 5 a.m. I'm

not through with you." Dr. Aguirre said he would text Dr. Lock to let him know Jane Doe would be

leaving at 5 a.m. Jane Doe grabbed her things and left.

54. Jane Doe arrived at the Hospital for her shift, went to the bathroom and sat there trying to

compose herself. At 7:33 p.m. Dr. Aguirre texted Jane Doe and told her that he messaged Dr. Lock

and told him that Jane Doe would be getting off at 5 a.m. At 7:41 p.m. Dr. Moses, who is the doctor

that works the opposite shift as Dr. Lock, texted Jane Doe and asked if she was working that night.

Jane Doe told Dr. Moses that she was working and asked if he was working. Apparently, Dr. Lock

and Dr. Moses had swapped shifts for that night and the next night. Jane Doe then messaged Dr.

Aguirre and asked if he knew that Dr. Moses was working and he said he thought Dr. Lock was

working.

55. Dr. Aguirre told Jane Doe to call him which she did. Dr. Aguirre told Jane Doe that Dr.

Lock just messaged him and told him that he swapped shifts with Dr. Moses. Jane Doe told Dr.

Aguirre that she couldn't leave at 5 a.m. since she was working with Dr. Moses. Dr. Aguirre

responded by commanding Jane Doe to "Just come back when you're not busy. I'll be watching the

board." Jane Doe remembered Dr. Aguirre told her that he watches the ER tracking board and

would know if Jane Doe were not busy because he would be keeping track of the work that she was doing. Jane Doe also knew that Dr. Aguirre could look at the patient charts and see who was doing the documentation for the admits. For this reason, Jane Doe knew she would not be able to lie to Dr. Aguirre about being busy.

56. Jane Doe went to the physician's lounge to see Dr. Moses since they do not normally work together. Jane Doe mentioned during her conversation with Dr. Moses that she had been there since 3:45 p.m.. Dr. Moses told Jane Doe to go lay down and rest and that he would take the phone and do the admits until 11:00-11:30 p.m., and then Jane Doe could take over. Jane Doe at first went back to the GME, but felt she had no real choice but to return to Dr. Aguirre's hotel as he had commanded because she was scared of the consequences if she did not comply. Jane Doe knew Dr. Aguirre had the power to keep tabs on her due to his position, and the ability to cancel her contract. Jane Doe was traumatized, confused, and not thinking clearly.

57. At approximately 8:18 p.m. Jane Doe told Dr. Aguirre she was on her way back. When Jane Doe arrived at Dr. Aguirre's room she tried to use the keycard but it wouldn't work. She knocked on the door and then swiped the key card again, which worked and unlocked the door. Just as Jane Doe was about to open the door Dr. Aguirre opened the door. Dr. Aguirre quickly opened the door and walked back to his bed. Jane Doe noticed that he was completely naked. Dr. Aguirre's skin was very loose and flabby like someone who had weight loss surgery or had lost a large amount of weight in a short amount of time. By the time Jane Doe got fully into the room, Dr. Aguirre was already back in bed, sitting up with his back against the headboard with the covers over him.

58. Dr. Aguirre summoned Jane Doe to the bed, and when she sat down he instructed her "You have too many clothes on, you need to take your clothes off." Jane Doe complied, and then he lifted up the covers for her to get in bed with him. Jane Doe was not operating from a place of free will or rational decision making. Jane Doe was terrified and disassociated, trying to process everything that

happened while simultaneously fearing what was going to happen next. She felt completely powerless.

59. Dr. Aguirre started talking but due to Jane Doe's heightened state of fear, she was disassociated from the conversation. Dr. Aguirre's demeanor was again cold and threatening. Jane Doe remembers a hockey game playing on the TV, and Dr. Aguirre mentioned something about one of the doctors at Merit Health, but Jane Doe does not remember what he said. Dr. Aguirre then started talking about speaking Spanish. He said native speakers think that he is a native speaker even though he is American because he speaks Spanish so well. He said that was because his dad made him exclusively speak Spanish at home growing up. Dr. Aguirre told Jane Doe that if he didn't speak Spanish his dad would "beat the shit out of me". Dr. Aguirre said his dad would tell him to go in his room and pull his pants down, and then his dad would go in there and beat him.

60. Dr. Aguirre became disturbingly expressionless and started kissing Jane Doe forcefully. Dr. Aguirre pulled his covers off, grabbed Jane Doe's hair roughly with his right hand and pushed her head down to perform oral sex. Jane Doe noticed that he was completely clean shaven with no stubble. While Jane Doe was forced to perform oral sex Dr. Aguirre commanded her to "lick my balls" and she complied. Jane Doe was forced to perform oral sex for several minutes and then Dr. Aguirre forced her to get on top of him, facing him, and forcefully penetrated her vaginally. During this time Dr. Aguirre told Jane Doe "I knew that day that you came in my office that you wanted to fuck me." Jane Doe asked "what made you think that?" and he replied "because of the way you looked at me, nobody looks at me that way." Then he pushed her head down toward his chest and commanded her to bite his nipples.

61. Jane Doe complied and Dr. Aguirre demanded that she bite them harder. When she bit them harder he immediately started thrusting his penis more forcefully into her vagina. Jane Doe asked Dr. Aguirre if he was "was into pain?" and Dr. Aguirre replied "I don't want to lose my nipples but

yes, it turns me on." At this point Jane Doe became even more fearful. Not only was he forcing her to have nonconsensual sex, she was afraid he would take it further because he would enjoy making her suffer. Jane Doe was paralyzed with fear and her mind detached.

62. Dr. Aguirre took Jane Doe's hands and held her hands so that she could not hold onto the headboard to steady herself. At some point Dr. Aguirre let go and pinched both of her nipples extremely hard. It caused severe pain in her left nipple but she couldn't feel it on the right side because she had breast implants removed and suffered nerve damage. Jane Doe told Dr. Aguirre that she had nerve damage to her breast. He asked why and she told him it happened after she had implants removed. Dr. Aguirre asked why she did that and she told him they were making her very ill. Dr. Aguirre then asked if she could get them back, and Dr. Aguirre slapped Jane Doe's thighs and butt several times.

63. While Dr. Aguirre was forcing Jane Doe to have sex with him she became extremely hot and felt like she was going to pass out. Jane Doe was sweating and told Dr. Aguirre that she really needed a break. He said he wasn't hot and he continued to force Jane Doe to have sex with him. Jane Doe again said that she really needed to take a break and told Dr. Aguirre "I'm really hot." Dr. Aguirre responded coldly and condescendingly "oh, you need a break." Dr. Aguirre let Jane Doe get up and sit on the side of the bed momentarily before he immediately grabbed her head, pushed her head down and forced Jane Doe to perform oral sex, again causing her to gag.

64. Simultaneously, Dr. Aguirre forced his fingers into Jane Doe's anus. Jane Doe was still extremely hot, out of breath, extremely traumatized and said again that she needed a break. Jane Doe was finally able to break away and saw an unopened bottle of water on the nightstand. She grabbed the water, opened it, and started drinking. Jane Doe was facing the window and the air conditioner so she laid on her right side to cool off.

65. Dr. Aguirre had been laying on his back the entire time with his back against the headboard. As soon as Jane Doe laid on her side Dr. Aguirre flipped over onto his right side and immediately penetrated her anally, forcefully and very roughly. Jane Doe was in severe pain because there was no lubrication, and Dr. Aguirre was thrusting himself into her very forcefully for an unknown amount of time. At some point Dr. Aguirre stopped and forced Jane Doe to perform oral sex again by grabbing her hair and pushing her head down forcefully, gagging her again. He commented that Jane Doe was "particularly skilled" at oral sex and said to Jane Doe "you have to be good at blowjobs because you don't have big tits anymore. When you had big tits, you could just lay there."

66. Dr. Aguirre then forced Jane Doe back on top of him, facing him, and again penetrated her vaginally. This time Dr. Aguirre started slapping Jane Doe in her face, violently. He slapped her multiple times. Several times Jane Doe's hair got in the way, preventing him from making solid contact. When this happened Dr. Aguirre would hit her repeatedly until he made forceful contact. Once Dr. Aguirre slapped Jane Doe really hard on the right side of her face and ear causing her right ear to immediately start ringing, and she lost some of her ability to hear. The hearing loss lasted several days, and  Jane Doe has had intermittent ringing in her right ear since the incident.

67. Dr. Aguirre would become obviously sexually stimulated when he was hitting Jane Doe. He would thrust himself more forcefully into her while hitting her. Dr. Aguirre told Jane Doe she was "keeping him hard because she was so wet", but she knew this was not true. Jane Doe had issues with vaginal dryness, for which she uses a prescription for vaginal estrogen that her doctor prescribed earlier that year.

68. At some point Dr. Aguirre said "you're so fucking hot" and began to choke Jane Doe by placing one hand around her throat. As Jane Doe was trying to pull away Dr. Aguirre began using both of his hands to put pressure on both of her carotid arteries. Jane Doe knew this could cause loss of consciousness and can cause death. Jane Doe was terrified because she was unable to pull

away and was scared Dr. Aguirre was going to kill her. Jane Doe began getting short of breath and having tunnel vision. Jane Doe thought she was going to lose consciousness so she closed her eyes and focused on breathing to try and prevent that from happening. Jane Doe tried not to outwardly show any fear or emotion because she didn't want to give him that satisfaction. Jane Doe did not fight back because she was scared Dr. Aguirre would hurt her worse than he already had.

69. Jane Doe was just trying to stay neutral. During this time Dr. Aguirre was penetrating her faster, deeper and more forcefully. Jane Doe believes he was getting pleasure from hurting her, and he only stopped when he saw her eyes were closed because he thought she lost consciousness. Jane Doe felt woozy and things were a bit blurry.

70. At that point, Dr. Aguirre commanded her to turn around and face away from him, and he again penetrated her anally. As Dr. Aguirre was forcefully raping Jane Doe anally he grabbed her hair and yanked her head back extremely hard, immediately causing pain to her head and neck. Jane Doe felt like Dr. Aguirre ripped her hair out. When Dr. Aguirre forcefully yanked Jane Doe's hair it caused her to be off balance, and she immediately put her hands back to catch herself. However, Dr. Aguirre grabbed her hands/wrists and held them behind her to purposely keep her off balance such that he could penetrate her deeper. Jane Doe felt as if this went on for what seemed like an eternity. While Dr. Aguirre was raping Jane Doe anally he said "I'm going to get you a toy for the next time."

71. Dr. Aguirre eventually stopped, pulled out, and Jane Doe sat up on the side of the bed. Dr. Aguirre went to the bathroom and when he came back Jane Doe went to the bathroom. When Jane Doe got up her hips were in extreme pain from being forced to participate in sexual intercourse, anal penetration, and beaten for 2 hours. Jane Doe also noticed blood on the sheets where she had been sitting. When Jane Doe went to the restroom, she did not turn on the light, but there was enough light to see somewhat because the TV was illuminating the mirror in the bathroom. Jane Doe peed and when she wiped it was very painful. Jane Doe's vagina and rectum were hurting.

72. As Jane Doe was walking past the mirror to exit the restroom she could see her hair was disheveled and her face was very red from being hot, slapped, and choked. Jane Doe saw Dr. Aguirre's brush sitting on the vanity and used it to fix her hair the best she could. She didn't want him to question why she was in the bathroom for so long because she felt scared, so she told him she used his brush. Dr. Aguirre responded "Oh, good. Now your DNA is here. So, if you bludgeon me to death, they'll know it was you." Jane Doe replied, "well, I don't plan on bludgeoning you to death, so I guess you live to see another day." Dr. Aguirre responded, "Yeah, and you live to get fucked another day." Dr. Aguirre then mentioned he liked watching Dateline and Forensic Files.

73. Jane Doe could not tell if it was 10:20 p.m. or 10:30 p.m. because the digital hotel alarm clock had a light out. At some point Dr. Aguirre told Jane Doe he had "erection perseverance." Jane Doe checked the time on Dr. Aguirre's phone that was on the nightstand and saw it was 10:30 p.m. Jane Doe told Dr. Aguirre she had to leave because she had to be back at the Hospital by 11:00 p.m.. Jane Doe proceeded to get dressed. As Jane Doe was leaving Dr. Aguirre told her if she got bored to come back. Jane Doe went back to the Hospital and noticed when she went to the bathroom that there was blood in her underwear from her rectum.

74. The next morning Dr. Aguirre texted Jane Doe casually as if he did not repeatedly sexually assault her the night before. Fearing for her job security and physical safety, and influenced by being a victim of childhood sexual abuse, Jane Doe exchanged casual texts with Dr. Aguirre on Friday and Saturday in an attempt to humor him. Jane Doe was in shock and trying to appease Dr. Aguirre because she was scared, traumatized and feared she would receive retaliation from Merit Health. On Saturday night Dr. Aguirre messaged Jane Doe "if you get bored…" Dr. Aguirre texted Jane Doe again the following Saturday which Jane Doe did not respond to. Dr. Aguirre attempted to call Jane Doe the following Monday and she did not answer.

75. Jane Doe finished her work week at 5 a.m. on May 29, 2025. On the morning of May 30, 2025 Jane Doe told her husband about Dr. Aguirre raping her. This was the first opportunity to speak with her husband when their daughter was not around.

76. On May 31, 2025, Jane Doe texted Rae Anne Pantermoeller ("Pantermoeller") who works in HR at Wesley and asked her to call her. On June 2, 2025 Pantermoeller texted Jane Doe back and Jane Doe called her to tell her what happened. Pantermoeller asked Jane Doe if she could come in for a meeting later that day. Pantermoeller told Jane Doe that Brant Stringer ("Stringer"), the HR manager, would be calling Jane Doe. Jane Doe told Pantermoeller that she could come in for a meeting after she went to the police to make a report. Cain from administration, not Stinger the HR manager, called Jane Doe and asked what happened and Jane Doe told him.

77. After going to the Hattiesburg Police Department and filing an initial report Jane Doe and her husband went to HR and had a meeting with Stringer and Pantermoeller. Jane Doe told them what happened. Stringer told Jane Doe that someone would be in touch with her after Stringer spoke with corporate HR.

78. About half an hour after this meeting, Dr. Aguirre called Jane Doe. She did not answer. Jane Doe notified Stringer that Dr. Aguirre called her. Stringer called Jane Doe back later and said corporate HR was requesting a screenshot of the missed call Jane Doe received from Dr. Aguirre and proof it was his phone number. Jane Doe sent Stringer what he requested. Jane Doe asked Stringer if Dr. Aguirre knew that she reported what he did, and Stinger told Jane Doe he *did not know* whether Dr. Aguirre knew or not.

79. Although Jane Doe loved her job at Merit Health and wanted to return to work, she was unable to do so in a night shift capacity. The Hospital is un-secured (anyone can enter any time). During the night shift Jane Doe was often alone. Due to the nature of the sexual assaults and abuse Jane Doe endured at the hands of Dr. Aguirre, and the fact those assaults were reported by Jane

Doe to Merith Health HR and Dr. Aguirre was apparently aware of same, Jane Doe was terrified to return to work under the unsecured and often alone conditions that existed in relation to working the night shift. Jane Doe expressed her willingness to work the day shift because there are always lots of people around during the day and she would feel secure in that environment, assuming Dr. Aguirre would not be present and acting as her supervisor.

80. However, Merit Health refused to provide reasonable accommodations for Jane Doe to ensure her safety, and insisted that if Jane Doe were to return to work it must be for the night shift. To add insult to injury, the Merit Health Defendants told Jane Doe that it concluded the violent, heinous sexual assaults by Dr. Aguirre were in reality *consensual* sexual relations by Jane Doe.

81. These acts resulted in intolerable working conditions that made it impossible for Jane Doe to return to work at Merit Health, resulting in a constructive discharge of Jane Doe from the job she loved. While Jane Doe actively sought other employment to mitigate her damages, she has not been able to find another job that pays as much money as she was making at Merit Health.

## **CAUSES OF ACTION**

### **Count I – Alter ego/Co-principals (Against Merit Health)**

82. Plaintiff incorporates all paragraphs into this section.

83. Defendant CHS is a parent corporation that owns and operates hospitals, including the hospital in Hattiesburg Mississippi d/b/a Merit Health Wesley. On information and belief, CHS set the policies that governed employment of medical professionals at all of its hospitals during all times relevant to this Complaint. Defendants CHSPSC, Wesley Health, Wesley Physician, HBMS, QHG Forrest County, and QHG Hattiesburg are all wholly owned subsidiaries of CHS. Each of these entities lists its principal office address as 4000 Meridian Blvd, Franklin, TN 37067, and identifies the same core individuals as its Officers, Directors, and/or Members (including but not limited to Justin Pitt and Kevin Hammons).

84. Defendant CHSPSC at all material times served as the "Management Company" for CHS's hospitals, including Merit Health Wesley. In that capacity, with the authority granted by CHS, CHSPSC exercised dominion and control over every aspect of hiring, employment, and supervision of medical professionals working at/for Merit Health Wesley. Defendant Wesley Health is on information and belief the designated owner/operator of Merit Health Wesley, but at all material times is and was controlled by CHS and CHSPSC. Defendant Wesley Physician is listed as the "Employer" on certain employment agreements with Jane Doe and other employees working at Merith Health Wesley, but at all material times is and was controlled by CHS and CHSPSC. Defendant HBMS is listed as the "Employer" on certain employment agreements with Jane Doe and other employees working at Merith Health Wesley, but at all material times is and was controlled by CHS and CHSPSC. Defendant QHG Hattiesburg is listed as the "Legal Employer" on certain employment documents (pay records) with Jane Doe and other employees working at Merith Health Wesley, but at all material times is and was controlled by CHS and CHSPSC. Defendant QHG Forrest County was formed on the same date as QHG Hattiesburg, and has the same members and same principal office address as all of the named entities. On information and belief, QHG Forrest County was involved at all material times with the operation of Merit Health Wesley, but at all material times is and was controlled by CHS and CHSPSC.

85. At all relevant times, the Merit Health entities held themselves out as doing business as a hospital d/b/a Merit Health Wesley, in Hattiesburg, Mississippi. These entities did not operate as independent actors but as wholly owned subsidiaries, divisions, instrumentalities, and/or alter egos of CHS and CHSPSC.

86. The Merit Health entities are affiliated entities organized under Delaware or Mississippi law, but doing business in Mississippi to provide services at and for the hospital d/b/a Merit Health Wesley. Each is wholly owned, operated, and controlled by CHS, and they function as

instrumentalities and co-principals and alter egos of one another, and as co-employers of medical personal working at the Hospital (including Dr. Aguirre and Jane Doe) in the following, non-exclusive ways:

    a.  They share common and overlapping management, officers, directors, and decision makers;

    b.  They share a common state of incorporation and/or physical principal office address;

    c.  The permit free flow of profits and/or capital from one to the other, allowing even different entities than those named as "employer" in employment agreements to pay salaries and wages;

    d.  They maintained common control over labor relations, including vetting, hiring, training, firing, supervision, and disciplinary decisions;

    e.  They presented themselves to the public, to patients, and to employees as a single, unified hospital system "Merit Health Wesley";

    f.  They acted in concert to manage and direct the hiring and employment and conduct of Dr. Aguirre and Jane Doe; and

    g.  Other acts to be shown at trial.

87. These Merit Health Defendants are ultimately owned or controlled by CHS. CHSPSC provided the management services on behalf of CHS which blurred the lines of which specific entity was operating the Hospital. Plaintiff signed employment agreements with both Wesley Physician Services, LLC and Hattiesburg HB Medical Services, LLC, both within the CHS/CHSPSC network and both contracts for employment at the Hospital. However her pay stubs showed the legal employer was a different CHS wholly owned subsidiary, QHG Hattiesburg. The employment agreements reference policies and procedures that on information and belief govern labor and employment practices and relations in all of the CHS subsidiaries doing business in Mississippi (and elsewhere), and permit unilateral assignment of Jane Doe's employment to any of the CHS subsidiary and affiliate companies.

88. The Merit Health entities named herein, all of whom are subsidiaries of CHS, were formed solely to hold assets and/or shield liability from the other higher net worth entities including CHS, CHSPSC, and/or Wesley Health System LLC, all of whom were d/b/a Merit Health Wesley. Each of these Defendants operated under the Merit Health brand, ultimately owned by CHS, but undistinguishable to employees. This unity of interest and lack of separateness and use of subsidiaries to shield liability support piercing the corporate veil under appliable law.

89. Therefore, Defendants CHS, CHSPSC, Wesley Health, Wesley Physician, HBMS, QHG Hattiesburg, and QHG Forrest County, and each of them, are alter egos, co-principals, and joint employers of Dr. Aguirre and Jane Doe, who are jointly and severally liable to the Plaintiff for the acts and omissions complained of herein, and/or who jointly participated in alleged acts and torts and violations against the Plaintiff. To the extent net worth is considered in the context of a punitive damages award, the combined net worth of all of the Merit Health Defendants should be considered.

## Count II – Respondeat Superior

90. Plaintiff incorporates all other paragraphs into this section.

91. At all material times, Dr. Aguirre was an employee of Defendants CHS, CHSPSC, Wesley Health, Wesley Physician, HBMS, QHG Hattiesburg, and QHG Forrest County (collectively "Merit Health"), who was acting within the course and scope of his employment. As such, the knowledge, acts, and omissions of Dr. Aguirre are imputed to Merit Health, and Merit Health is liable for his acts and omissions pursuant to the doctrine of *respondeat superior*.

## Count III - Title VII Sexual Harassment and Discrimination, Including Sexual Harassment, Hostile Work Environment, Quid Pro Quo Sexual Harassment, Sex Discrimination, Retaliation, Constructive Discharge, and Failure to Accommodate (Against Merit Health)

92. Plaintiff incorporates all other paragraphs into this section.

93. Pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a), it is an unlawful employment practice for an employer "(1) to fail or refuse to hire or to discharge any individual, or to otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's … sex …; or (2) to limit, segregate, or classify his employees … in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's … sex."

94. Title VII prohibits sexual harassment in the workplace. *Wallace v. Performance Contractors, Inc.,* 57 F.4ᵗʰ 209, 220 (5ᵗʰ Cir. 2023)

95. Jointly, the corporate/LLC Defendants collectively referred to herein as "Merit Health" constitute a single integrated enterprise with more than 15 employees, and also constitute "joint employers" of Dr. Aguirre and Jane Doe. Each of these entities collectively engaged in and utilized

      a. interrelation of operations,

      b. centralized control of labor relations,

      c. common management, and

      d. common ownership and financial control.

96. Jane Doe and Dr. Aguirre were employees of the Merit Health entities, and each of them, within the meaning of Title VII, 42 U.S.C. § 2000e.

97. Jane Doe, as a female, is a member of a protected group.

98. The individual the Merith Health Employees hired and tasked to act as Jane Doe's Supervisor/Manager/Boss, Dr. Aguirre, engaged in offensive conduct of a sexual nature and harassed Jane Doe on the basis of her sex. Jane Doe was subjected to unwelcome sexual harassment by Dr. Aguirre, including but not limited to:

a. Being asked/directed to go to Dr. Agurirre's Merit Health supplied hotel room, adjacent to the hospital, to discuss her work schedule after being told by Dr. Aguirre that he would get her moved from night shift to day shift and that he would modify her night shift to work less hours (for the same money) until the day shift became available;

b. Being forcefully prevented from leaving Dr. Aguirre's hotel room after meeting him there to discuss her work schedule;

c. Being forcefully, repeatedly grabbed, groped, and kissed by Dr. Aguirre against her will;

d. Being forcefully, repeatedly vaginally raped by Dr. Aguirre against her will;

e. Being forcefully, repeatedly anally raped by Dr. Aguirre against her will;

f. Being forced to repeatedly perform oral sex on Dr. Aguirre against her will;

g. Being forcefully slapped, beaten, and choked by Dr. Aguirre while he raped her against her will;

h. Being threatened by Dr. Aguirre (expressly and suggestively) that non-compliance with his perverse sexual commands may result in termination of her contract, and/or severe beatings, and/or the termination of her life;

i. Having Dr. Aguirre put his hands in her underwear, on her breasts, and forcefully insert his fingers into her vagina against her will;

j. Having Dr. Aguirre grab her hair aggressively, push her head down, forcing Jane Doe to perform oral sex on at least four different instances against her will;

k. Being told by Dr. Aguirre that he had the ability to cancel her contract and forcing her to perform oral sex after she said she had to leave to go back to work at the Hospital;

l. Being commanded by Dr. Aguirre to "[c]ome back … I am not through with you" after he sexually assaulted her;

m. After being sexually assaulted by Dr. Aguirre, being told by Dr. Aguirre to come back to when Jane Doe was not busy and that he was watching the board at work such that he would know when Jane Doe was not busy;

n. Being forced to go back to Dr. Aguirre's hotel against her will, fearing the consequences if she did not comply;

o. Being forced to take her clothes off by Dr. Aguirre against her will;

p. Being forced by Dr. Aguirre to lick his balls against her will;

q. Being forcefully penetrated vaginally by Dr. Aguirre on multiple instances against her will;

r. Being told by Dr. Aguirre "I knew that day you came in my office that you wanted to fuck me";

s. Being forced by Dr. Aguirre to bite his nipples against her will;

t. Being forced to have nonconsensual sex by Dr. Aguirre;

u. Having her nipples severely pinched by Dr. Aguirre, against her will;

v. Being slapped on her thighs and butt several repeatedly by Dr. Aguirre, against her will;

w. Having Dr. Aguirre force his fingers into her anus, against her will;

x. Being forcefully penetrated anally by Dr. Aguirre on at least two different instances, against her will;

y. Being slapped in the face and ear multiple times by Dr. Aguirre and once so hard Jane Doe lost some ability to hear in her right ear and still suffers ringing in her ear, against her will;

z. Being choked by Dr. Aguirre to the point of almost losing consciousness, against her will;

aa. Having Dr. Aguirre grab her hair and yank it extremely hard causing pain to her head and neck, against her will;

bb. Being told "you have to be good at blowjobs because you don't have big tits anymore. When you had big tits, you could just lay there" by Dr. Aguirre;

cc. Being told "I'm going to get you a toy for the next time" by Dr. Aguirre;

dd. Being threatened, when Dr. Aguirre finally let her leave after repeatedly raping her, that "you live to get fucked another day" by Dr. Aguirre;

ee. Being called by Dr. Aguirre on her cell phone less than half an hour after reporting his sexual assaults to the Merit Health HR Department; and

ff. Other instances to be shown at trial.

99. Dr. Aguirre's actions, including luring Jane Doe to his hotel room to discuss work issues, unwanted and unwelcome sexual assaults, sexual words and innuendos, sexual threats, and job security threats were so severe or pervasive that they constituted sexual harassment of Jane Doe. Dr. Aguirre's comments and actions including the unwanted and unwelcome sexual assaults and threats of contract termination were also sufficiently severe or pervasive as to alter the terms, conditions and privileges of Jane Doe's employment, and to create an abusive, intimidating, hostile, and offensive working environment for Jane Doe.

100. By making it clear to Jane Doe that compliance with his unwelcome sexual demands and assaults was necessary to avoid having her contract of employment terminated, and to obtain a promised reassignment to a more favorable day shift and promised reduction of hours during the night shift (with no change in pay) while waiting for the day shift to become available, Dr. Aguirre, as Jane Doe's Supervisor/Manager/Boss, engaged in quid pro quo sexual harassment of Jane Doe.

101. At all material times Dr. Aguirre had the power to make decisions regarding job assignments and terms and conditions of Jane Doe's employment with Merit Health, including the power to fire, promote, fail to promote, demote, and reassign Jane Doe. Dr. Aguirre made it clear to Jane Doe that he had the power to terminate her employment contract and change her work schedule. Therefore, Dr. Aguirre was at all material times a Title VII Supervisor over Jane Doe for and on behalf of the Merit Health defendants. As such, the Merit Health Defendants, and each of

them, are strictly liable for the unwelcome sexual harassment, hostile work environment, quid pro quo sexual harassment, and sex discrimination of/against Jane Doe by Dr. Aguirre.

102. Prior to Jane Doe reporting Dr. Aguirre's sexual assaults and misconduct to Merit Health and the Hattiesburg Police Department, and making a report to the EEOC, Jane Doe had been told, first by Cain and CEO Sisson, and then by Gutermuth, and then by Dr. Aguirre, that she would be moved to the day shift. After making those reports, and after telling Merith Health that she did not feel safe enough to resume working during the night shift due to the open accessibility and lack of adequate security and her reasonable fear of reprisal by Dr. Aguirre, Merit Health told Jane Doe that if she wished to return to work with Merit Health it must be during the night shift. Thereby, the Merit Health Defendants, and each of them, engaged in retaliation against Jane Doe in violation of Title VII.

103. After reporting the assaults described herein, Jane Doe feared for her safety if continuing to work at the Hospital and/or Merit Health after she was told that Dr. Aguirre may or may not have known she reported him, and that fear escalated once she was later informed Dr. Aguirre knew she reported him for sexual harassment and brought charges for sexual assault. Because Jane Doe worked nights when there were not many people in the Hospital, and the Hospital was not secure, she was reasonably mortally afraid of returning back to work at the hospital during the night shift. The Merit Health entities told Jane Doe's representative that Dr. Aguirre was "no longer employed," but did not tell Jane Doe where Dr. Aguirre was (whether he remained in Hattiesburg or was elsewhere). Jane Doe developed a reasonable overwhelming fear of working the night shift when she would frequently be alone in the unsecured hospital, stoked by the violence of Dr. Aguirrre's assaults, the implications of this threats, and Dr. Aguirre's attempt to contact her immediately following her reports to Merit Health of his misconduct.

104. However, when Jane Doe asked for a reasonable accommodation to overcome this fear –
of being allowed to work the day shift when there were many more people present in the hospital,
this accommodation was refused by Merit Health. Jane Doe was told by Merit Health that if she
wished to return to work it would have to be to work the night shift. Further, Merit Health did not
offer Jane Doe *any* counseling, resources, or support of any type to help her process the violent
sexual assaults against her by her Supervisor/Manager/Boss. Merit Health knowingly permitted Dr.
Aguirre's harassment, and/or failed to take reasonable steps to remedy the conditions and concerns
that led to Plaintiff's resignation, or make reasonable accommodations for Plaintiff as a result
thereof. These facts created working conditions that were so intolerable a reasonable person in Jane
Doe's position would feel compelled to resign. As a result of these conditions, Jane Doe was
constructively discharged and left the employ of Merit Health, which result was a foreseeable
consequence of Merit Health's actions (and inactions).

105. The Merit Health entities, and each of them, individually and by and through their
collective employee, Dr. Aguirre, violated Jane Doe's rights under Title VII (42 U.S.C. § 2000e, et
seq.) by engaging in actions and/or activities constituting the sexual harassment and sexual
discrimination against Jane Doe, and creating a hostile work environment, as alleged above. These
violations by Dr. Aguirre, and by the Merit Health entities by and though their employee Dr.
Aguirre, were based upon Jane Doe's sex, and affected the terms, conditions and/or privileges of
her employment with Merit Health. With respect to those allegations incorporated above, Jane Doe
contends that the actions, practices, and omissions on the part of the Defendants, and each of them,
caused her to be unlawfully discriminated against on the basis of her sex, as a result of which her
civil rights have been unlawfully violated.

106. Since the sexual discrimination and harassment against Jane Doe was committed by Jane
Doe's Title VII Supervisor with the authority to alter or terminate her employment and influence the

conditions of her employment and rate of pay, it is not necessary to demonstrate that the Merit Health entities knew or should have known of the harassment and failed to take prompt remedial action for Jane Doe to sustain viable claims against the Merit Health entities.

107. However, Jane Doe alleges that the Merit Health entities, and each of them, knew or should have known of the unlawful conduct of Dr. Aguirre and/or the propensity to commit same. It seems likely that this is not the first time Dr. Aguirre has engaged in similar conduct. Merit Health's failure to remedy and prevent such violations of law established ongoing and pervasive sexual harassment and sexual discrimination, and a hostile work environment, as the custom and policy of Merit Health.

108. The Defendants', and each of their, discriminatory practices caused Jane Doe harm, including but not limited to extreme physical pain and disability, embarrassment, humiliation, degradation, fear, stress, anxiety, inconvenience, mental and emotional anguish, mental and emotional pain and suffering, loss of self-esteem, lost wages, loss of career opportunities, loss of enjoyment of life and other non-pecuniary damages in amounts to be determined by the Jury at trial. Jane Doe incurred medical expenses in the past, and expects to incur medical expenses in the future, for treatment of the physical and emotional injuries caused by Defendants – which have caused Jane Doe physical and emotional suffering in the past and are reasonably expected to cause such pain, suffering and damages in the future. In addition, Jane Doe incurred attorney's fees and other costs related to the prosecution of this action to enforce her rights. All of these damages and consequences were foreseeable to Defendants as consequences of their unlawful conduct.

109. Accordingly, the Defendants, and each of them, violated Jane Doe's rights protected by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-et. seq., for which they should be held liable, jointly and severally.

110. The harassing and discriminatory practices that were engaged in as described above by Dr. Aguirre, who at all material times was acting pursuant to the authority of the Merit Health entities in a managerial capacity over Jane Doe, were undertaken within the course and scope of Dr. Aguirre's employment – during his and Jane Doe's active work shift and when she went at his request to visit him to discuss Jane Doe's work schedule. Further, those discriminatory practices by Jane Doe's supervisor/manager, Dr. Aguirre, were undertaken with malice and/or reckless indifference and disregard for the federally protected rights of Jane Doe. On information and belief, Dr. Aguirre did not receive adequate or sufficient training or supervision from Merit Health on sexual harassment in the workplace. Further, the described acts and conduct of Dr. Aguirre and the Merit Health Defendants represent reckless or indifferent disregard of Jane Doe's rights. As such, the Merit Health Defendants are liable for punitive damages, in an amount sufficient to punish and deter future similar conduct, to be determined by the Jury in this cause.

## Count IV –Negligent and/or Grossly Negligent
## Hiring, Training, Retention and Supervision (Against Merit Health)

111. Plaintiff incorporates all other paragraphs into this section.

112. Defendants, the Merit Health entities and each of them, had duties to Jane Doe and other, similarly situated employees when hiring employees, including but not limited to a duty to perform a detailed, comprehensive background check of its employees, including Dr. Aguirre.

113. On reasonable belief, this is likely not the first instance Dr. Aguirre has sexually harassed and/or assaulted other subordinates and/or used his supervisory/managerial power to take advantage of his subordinates in exchange for sexual favors.

114. Had Merit Health conducted a detailed, comprehensive background check on Dr. Aguirre, it would have known about, or knew and ignored, other complaints against Dr. Aguirre and of his unfitness to serve in the capacity in which Merit Health hired and empowered him.

115. At all material times Merit Health knew or should have known of Dr. Aguirre's propensity to sexually assault, batter, threaten, harm, harass, discriminate, sexually harass and discriminate against, or otherwise mentally, emotionally, or physically injure or demean his subordinates, including Jane Doe.

116. Defendant Merit Health had a duty to train and supervise its personnel in order to ensure the safety and well-being of its employees. Defendant Merit Health further had a duty to retain fit employees.

117. On information and belief, Merit Health failed to provide any training or policies regarding sexual harassment and/or discrimination prevention or policies regarding inappropriate supervisor relationships with subordinates. Alternatively, if Merit Health did have such training and policies, it failed to train its employees, including Dr. Aguirre, on and/or enforce same.

118. Defendant Merit Health negligently and/or grossly negligently breached each of the above duties, which breaches proximately and foreseeably caused or contributed to all of the harms and losses of Jane Doe discussed throughout this Complaint. Negligent and/or grossly negligent acts and omissions of the Merit Health entities, and each of them, include but are not limited to:

    a. Failed to exercise reasonable care in vetting and hiring Dr. Aguirre, assigning him a position of authority at the Hospital over employees such as and including Jane Doe, in providing him a hotel room adjacent to the hospital, and/or in providing supervision over his interactions with subordinates;

    b. Failed to establish and/or enforce reasonable criteria for the granting of, withdrawal, or reduction of supervisory privileges;

    c. Failed to exercise reasonable care to train Supervisors on reasonable employment and management practices;

d. Failed to exercise reasonable care to hold Supervisors accountable to employ reasonable employment and management practices;

e. Failed to exercise reasonable care to detect when actions or behavior of Supervisors are detrimental to employee work environment and/or safety, and/or unlawful, and/or knowingly permitted such behavior to continue;

f. Failed to exercise reasonable care to detect that actions or behavior of a Supervisor demonstrate noncompliance with State and Federal Law, and/or knowingly permitted such behavior to continue;

g. Failed to establish appropriate policies and procedures to prohibit and prevent, and educate about the prevention of, sexual harassment and/or discrimination, and/or failed to implement and enforce such policies if in place;

h. Failed to exercise reasonable care to detect that actions or behavior of a Supervisor are disruptive to its operation, and/or knowingly permitted such behavior to continue;

i. Failed to exercise reasonable care to detect that actions or behavior of a Supervisor created a hostile and/or discriminatory work environment, and/or knowingly permitted such behavior to continue;

j. Failed to exercise reasonable care to detect that actions or behavior of a Supervisor, in particular Dr. Aguirre, are unprofessional, unethical or illegal, and/or knowingly permitted such behavior to continue;

k. Failed to exercise appropriate and reasonable care in appointing Dr. Aguirre as an employee and Supervisor of Merit Health; and

l. Other acts and omissions to be shown at trial.

119. As a direct, proximate, and foreseeable of Defendant's actions and omissions, Plaintiff suffered injuries and losses as described throughout this Complaint, including emotional distress,

mental anguish, physical injuries and pain, and emotional suffering and humiliation requiring medical treatment in the past and in the future, as well as loss of earnings, past and future, for all of which Plaintiff is entitled to be compensated under law.

120. Further, the Merit Health entities, and each of their, acts and omission were undertaken taken in reckless disregard for Jane Doe's rights, and thereby warrant punitive damages against the Merit Health entities, and each of them, in an amount sufficient to punish those defendants and make an example to deter future, similar misconduct by Merith Health and other, similarly situated entities.

### Count V – Assault and Battery / Sexual Assault and Battery

121. Plaintiff incorporates all other paragraphs into this section.

122. Dr. Aguirre, while acting as Jane Doe's direct supervising physician, engaged in assaults and battery and sexual assaults and battery and rape on Jane Doe with the intent to cause harmful and offensive contact of a sexual nature with Plaintiff, without her consent.

123. The conduct and actions of Dr. Aguirre, including the uninvited and unwanted physical touching of Jane Doe by Dr. Aguirre in a sexual manner and forceful rape, sodomy, and oral sex, and sexual abuse (including slapping, choking, and pulling hair) constitute assaults and batteries. Dr. Aguirre intended to cause offensive physical contact with Jane Doe, Jane Doe was put in imminent apprehension of such contact, and the offensive contact actually occurred.

124. The intentional, non-consensual touching of Jane Doe by Dr. Aguirre including but not limited to forcefully penetrating Jane Doe's vagina and rectum, slapping Jane Doe in the face and ear several times, pulling her hair, forcing Jane Doe to perform oral sex on him, slapping her thighs and butt, pinching her nipples and choking Jane Doe to the point of almost losing consciousness were highly offensive to Jane Doe's reasonable sense of dignity, and caused her severe physical and emotional injuries and pain and suffering.

125. As a direct and proximate result of these tortious, unlawful, and wrongful acts and conduct of the Defendant, the Plaintiff suffered the injuries and damages described in this Complaint, is entitled to an award of compensatory damages for all economic and non-economic damages referenced herein and shown at trial.

126. Further, Dr. Aguirre's willful and wanton conduct, taken in callous and reckless disregard for Jane Doe's rights and with malice, warrant punitive damages against Dr. Aguirre in an amount sufficient to punish Dr. Aguirre and make an example to deter future, similar misconduct by Dr. Aguirre and other, similarly situated individuals.

### Count VI –Intentional Infliction of Emotional Distress (Dr. Aguirre)

127. Plaintiff incorporates all other paragraphs into this section.

128. At all times relevant to the instant cause of action, Dr. Aguirre engaged in outrageous conduct beyond all possible bounds of decency towards Jane Doe, with the intention to cause or with reckless disregard for the probability of causing Jane Doe to suffer severe emotional distress.

129. The capricious, willful, and intentional acts and omissions of Dr. Aguirre were reasonably foreseeable to inflict, proximately inflicted, and proximately will continue to inflict severe emotional distress on Jane Doe which has required Jane Doe to seek medical treatment, for all of which Jane Doe demands judgment in an amount to be determined by the Jury at the trial of this case.

130. As a proximate result of said conduct, Jane Doe has suffered and continues to suffer extreme harm, injuries, and damages, and reasonably expects to suffer them in the future, including but not limited to:

a. Severe emotional injuries and severe mental anguish;

b. Physical injuries, as well as physical pain and disability, along with other injuries to her person;

c. Past, present, and future physical and emotional pain and suffering which is grievous;

    d.  Medical bills and other medical related expenses which have been incurred in the past and which will be incurred in the future;

    e.  Embarrassment, humiliation, degradation, fear, stress, anxiety, and inconvenience;

    f.  Loss of earnings, past and future;

    g.  Loss of career opportunities;

    h.  Loss of enjoyment of life; and

    i.  Other non-pecuniary damages in amounts to be determined at trial.

131. As a result of these intentional, willful, malicious, and/or outrageous acts on the part of Dr. Aguirre, Jane Doe is entitled to an award of compensatory damages against Defendant for all economic and non-economic damages recoverable under law.

132. Further, Dr. Aguirre's willful and wanton conduct, taken in callous and reckless disregard for Jane Doe's rights and with malice, warrant punitive damages against Dr. Aguirre in an amount sufficient to punish Dr. Aguirre and make an example to deter future, similar misconduct by Dr. Aguirre and other, similarly situated individuals.

**Count VII – Negligent and/or Intentional Infliction of Emotional Distress (Merit Health)**

133. Plaintiff incorporates all other paragraphs into this section.

134. The Merit Health entities, and each of them, caused Jane Doe emotional distress, which ware reasonably foreseeable as result of their acts and omissions, by:

    a. Creating and harboring a work environment that allowed pervasive sexual harassment, assault, and battery;

    b.  Allowing its employee/direct supervisor of Jane Doe, Dr. Aguirre, to sexually harass, assault, and rape Jane Doe;

    c. Repeatedly promising Jane Doe that she would be moved to day shift before she reported Dr. Aguirre's sexual assaults, then refusing to make reasonable accommodations to enable Jane

Doe to return to work after she was sexually harassed, assaulted, and raped by her Supervisor/Director/Manager, Dr. Aguirre,

d. Failing to offer Jane Doe any counseling, support, or resources to help her process and recover from being violently sexually assaulted by the individual the Merit Health defendants assigned to be her Supervisor/Manager/Boss, and instead insisting she return to work during the night shift even after she shared her reasonable fear of doing so;

e. Claiming that Dr. Aguirre's violent sexual assaults of Jane Doe were in fact consensual sexual acts by Jane Doe, with the intention to cause or with reckless disregard for the probability of causing Jane Doe to suffer severe emotional distress

f. Other acts to be shown at trial.

135. As a foreseeable, direct and proximate result of these acts and omissions of Merit Health, Jane Doe suffered injuries and damages including, but not limited to:

a. Severe emotional injuries and mental anguish, requiring medical treatment,

b. Past, present, and future emotional pain and suffering which is grievous; and

c. Medical bills and other medical related expenses which have been incurred and which will be incurred in the future.

136. Merit Health's conduct, taken with reckless or indifferent disregard for Jane Doe's rights and emotional response, warrant punitive damages against Merith Health in an amount sufficient to punish those defendants, and each of them, and make an example to deter future, similar misconduct by the Merith Health defendants and other, similarly situated individuals.

**Count VIII - Negligent and/or Intentional Infliction of Emotional Distress (All Defendants)**

137. Plaintiff incorporates all other paragraphs into this section.

138. Dr. Aguirre's actions, including but not limited to his unwanted and non-consensual physical contacts, as well as Merit Health's constructive discharge of Jane Doe's employment, are of

such a nature to invoke outrage or revulsion in a civilized society, were directed to and intended to cause harm to Jane Doe, and in fact caused Jane Doe to suffer severe emotional distress, all of which were foreseeable to Dr. Aguirre and Merit Health.

139. The harms suffered by Jane Doe required her to receive medical care and therapy in the past, and will require Jane Doe to receive same in the future, all of which were foreseeable to Dr. Aguirre and Merit Health.

140. Merit Health knew, or should have known, of Dr. Aguirre's propensity to sexually harass and distress his female subordinates, which occurred during the course and scope of his employment, but allowed Dr. Aguirre's conduct for go forward.

141. As a direct, proximate, and foreseeable result of Dr. Aguirre's and Merit Health's intentional and/or negligent infliction of emotional distress, Jane Doe suffered the harms and losses discussed throughout this Complaint, for all of which she is entitled to be compensated by Defendants.

### Count IX – Attorney's Fees and Costs of Litigation

142. Plaintiff incorporates all other paragraphs into this section.

143. As direct and proximate cause of the Defendants', and each of their, acts and omissions, it was necessary for Jane Doe to retain legal services, and incur attorneys' fees and costs of litigation, in order to pursue her claims for violations of Jane Doe's civil rights and for unlawful employment practices against the Defendants.

144. Jane Doe is entitled to an award of reasonable attorney fees and costs as a part of the cost of prosecuting the present cause of action pursuant to Title VII as amended by the 1991 Civil Rights Act of the 1964 Civil Rights Act, and the Civil Rights Attorney's Fees Award Act 42 U.S.C. § 1988.

### <u>DAMAGES AND REMEDIES</u>

145. Plaintiff incorporates all other paragraphs into this section.

146. As a direct, proximate, and foreseeable result of Defendants', and each of their actions and omissions, Plaintiff is entitled to recover damages including, but not limited to, the following from the Defendants, jointly and severally, in amounts to be determined by the Jury at the trial of this cause:

a. Past, present, and future economic damages, including but not limited to medical bills, loss of earnings, and other incidental and consequential damages;

b. Past, present, and future non-economic damages, including compensation for emotional distress and mental anguish, inconvenience, pain, suffering, humiliation, shame, loss of enjoyment of life, loss of self-esteem, loss of her good name, loss of esteem and respect from the community, fear and embarrassment, injury to reputation, loss of career opportunities, and any other non-economic damages to be shown at trial;

c. All other economic and non-economic damages recoverable by law;

d. Attorneys' fees and expenses pursuant to 42 U.S.C. §2000e *et seq.*, as amended by the 1991 Civil Rights Act and 42 U.S.C. §1988, plus pre-judgment and post-judgment interest; and

e. All other damages, equitable, nominal, and/or other relief available to the Plaintiffs under federal and state law.

147. Defendants', and each of their, acts and omissions are so egregious as to evoke outrage and rise to the level of an independent tort, and/or represent reckless disregard for the safety and well-being of members of the public, including Jane Doe, such that Defendants and each of them should be required to pay exemplary and/or punitive damages, to the extent allowed by law, in an amount sufficient to punish Defendants, and to make an example to deter Defendants and others from engaging in such conduct in the future in amounts to be determined by the Jury of the trial of this cause.

148. To the extent punitive damages are awarded, Plaintiff is entitled to and prays for an additional, post judgment award of reasonable attorneys' fees and costs.

149. Jane Doe's injuries include permanent injuries that will have significant consequences for the rest of her life.

150. The aforesaid damages to the Plaintiff having been proximately and foreseeably caused by the aforesaid acts and omissions of the Defendants, and each of them, Plaintiff is entitled to sue and recover damages proximately resulting therefrom, including compensatory damages, economic damages, non-economic damages, punitive damages, attorney's fees, pre-judgment and post-judgment interest in the amount of 8% per anum or such other reasonable amount to be set by the Court, and such other relief as Plaintiff may be entitled to under applicable law.

Plaintiff demands judgment of and from the Defendants, and each of them, in an amount that will reasonably compensate Plaintiff for all of her injuries and/or damages, and to punish Defendants in order to deter future wrongful conduct, with said damages to include compensatory damages in an amount determined by the Jury, as well as punitive damages in an amount to be determined by the Jury, attorney's fees, and costs of these proceedings, pre-judgment and post-judgment interest, and such other relief as Plaintiff may be entitled to under applicable law, and any and all other relief this Honorable Court deems just, proper, and equitable.

Respectfully submitted this the 18th day of September, 2025.

**JANE DOE, PLAINTIFF**

BY: _____
CHRISTOPHER C. VAN CLEAVE (MSB 10796)

Christopher C. Van Cleave, Esquire (MSB 10796)
Taylor Clark, Esquire (MSB 106750)
Van Cleave Law, P.A.
146 Porter Avenue
Biloxi, Mississippi 39530
Phone: 228-432-7826

Fax:    228-456-0998
christopher@vancleavelaw.com
taylor@vancleavelaw.com
sandy@vancleavelaw.com